UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:03-CV-93-H

MAKER'S MARK DISTILLERY, INC.                                    PLAINTIFF

V.

DIAGEO NORTH AMERICA, INC., *et. al.*                           DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Maker's Mark Distillery, Inc. ("Maker's Mark"), brings this action alleging that

Defendants, Tequila Cuervo La Rojena S.A. de C.V., Casa Cuervo S.A. de C.V., Jose Cuervo

International, Inc. (collectively "Cuervo"), and Diageo North America, Inc. ("Diageo"),  violated

federal trademark and common law when they produced and distributed a bottle of tequila

capped with a red dripping wax seal similar to the one Maker's Mark has used for over 50 years.

Specifically, Maker's Mark asserts that Defendants' actions constitute (1) federal trademark

infringement, 15 U.S.C. § 1114(a) *et seq.*; (2) false designation of origin, 15 U.S.C. § 1125(a);

(3) dilution, 15 U.S.C. 1125(c); and (4) common law trademark infringement and unfair

competition under the laws of Kentucky. This Court conducted a six-day bench trial and is now

sufficiently advised to decide the numerous difficult factual and legal issues presented.

For the reasons explained below, the Court concludes that (1) Maker's Mark's red

dripping wax trademark is valid; and (2) Cuervo's use of a similar red dripping wax infringes on

Maker's Mark's trademark, but does not dilute the mark. Based on these findings, the Court will

issue an injunction prohibiting Cuervo's future use of red dripping wax, but decline to award

monetary damages.

**I.**

Plaintiff Maker's Mark is a Kentucky-based distiller specializing in bourbon whisky.[1] Since 1958, when it first began producing bourbon, the company has capped its bottles with a red dripping wax seal that partially covers the neck of the bottle and drips down to the bottle's shoulder. That design was the brainchild of Marjorie Samuels, mother of Maker's Mark current president Bill Samuels, who was still at home when his mother perfected the dripping wax in their family's basement. In its early years, Maker's Mark enjoyed slow and steady regional growth, but in August 1980, a front-page story in *The Wall Street Journal* thrust the company into the national spotlight.[2] The Samuels family sought to capitalize on that momentum by launching a national advertising campaign featuring the red dripping wax seal. The unique approach worked. Today, the company sells more than 800,000 cases of Maker's Mark annually in the U.S., with a bottle retailing at about $24. Company executives continue to focus most of their advertising budget – now around $22 million annually – on promoting the red wax.

Since 1985, Maker's Mark has held a federally registered trademark, U.S. Trademark Reg. No. 1,370,465, (the "465 trademark"), consisting of the "wax-like coating covering the cap of the bottle and trickling down the neck of the bottle in a freeform irregular pattern." Notably, the trademark does not mention the color red – it is silent as to color. This trademark later

---

[1] In 2005, Fortune Brands, Inc., purchased Maker's Mark from British distillery company Allied Domecq. Fortune, a Deerfield, Illinois-based holding company, owns several major brands, including Jim Beam bourbon, Canadian Club whisky, Sauza tequila, Titleist golf balls and Moen faucets.

[2] For many years, Maker's Mark sold more than 90 percent of its bourbon within Kentucky; over time those numbers have reversed and now more than 90 percent of the company's sales come from outside the state.

became "incontestable" pursuant to 15 U.S.C. § 1065.[3]  Though not asserted in this case, Maker's Mark registered another trademark in 2003, U.S. Trademark Reg. No. 2,690,813 (the "813 trademark"), which protects "the color red as applied to the seal that extends down the neck of a bottle." The 813 trademark does not include Maker's Mark's signature drips.

The Cuervo Defendants, a group of Mexican and American corporations, are America's largest sellers of tequila products. The Cuervo brand boasts an international reputation, and the companies sell more than 3.8 million cases of tequila per year in the United States. Company directors spend $100 million annually on advertising. Thus, the Cuervo Defendants outsize Maker's Mark by almost any conceivable measure of market presence – from sales numbers to international reach to annual advertising.

 The facts giving rise to this case began in the mid-1990s, when Cuervo executives decided to create a high-end tequila to celebrate the company's 200th anniversary of producing tequila products legally.  They designed the new product, Reserva de la Familia, ("Reserva"), in conjunction with a U.S. marketing firm and production began in 1995.  Initially, the Reserva bottle design included a straight-edge, non-dripping wax seal capping the bottle, along with a stamp of the Cuervo crest imprinted into the wax and a small blue ribbon extending from underneath the wax.

Juan Domingo Beckmann, now Chief Executive Officer of Casa Cuervo, testified that sometime around 1997, he decided to alter the wax seal to include dripping wax after seeing such a bottle in mid-production, before its drips were cut off.  Beckmann thought the uncut seal,

---

[3] A registered trademark becomes incontestable under §1065 after continuous use for five consecutive years subsequent to the date of registration. *Id.*  Once a mark is "incontestable," its registration constitutes "conclusive evidence of the validity of the registered mark," except as to certain statutorily enumerated challenges, including the functionality of the mark.  15 U.S.C. §1115(b)(8).

with its drips, created a unique and artisinal look. By 2001, Reserva, with its red dripping wax seal, had entered the U.S. market. Packaged in a wooden box designed each year by a different Mexican artist, it retailed for about $100 per bottle. Cuervo's production of Reserva was limited, with the company offering only about 3,000 to 4,000 bottles per year.

Defendant Diageo is a U.S.-based distributor of distilled spirits that marketed and distributed the contested Reserva product from at least 2001 to 2004.[4] In 2003, Maker's Mark initiated this lawsuit to challenge Diageo's marketing of the Reserva product with the red dripping wax seal. At some time after that, Cuervo abandoned its use of the drips, but continued to sell a version of Reserva capped by the original red, straight-edge wax seal.[5] In 2007, after Maker's Mark and Diageo attempted and failed to settle the case, Maker's Mark joined the Cuervo Defendants.

In November 2009, this Court held a six-day bench trial during which it heard testimony from numerous Maker's Mark employees, including: President and Chief Executive Officer Bill Samuels; Vice President of Operations and Master Distiller Kevin Smith; Vice President of Finance Mitchell Wagner; and Director of Marketing Barry Younkie. Maker's Mark also presented testimony from Susan Schwartz McDonald, an expert on markets and consumer recognition of brands; Krista Holt, a damages expert; Barry Guihan, a wax composition expert; Jim Duncan, a collector of Maker's Mark memorabilia; and Thomas Ryan a "bottle closure" expert.

---

[4] The evidence does not definitively resolve when the Reserva bottle with its wax drips was introduced in the U.S. or when it ceased being sold here.

[5] A separate lawsuit relating to Cuervo's general use of red wax seals is currently pending before this Court. *See infra* note 8.

On behalf of Cuervo, the Court heard testimony from Casa Cuervo Chief Executive

Officer Juan Domingo Beckmann; Cuervo Production Chief Alfredo Guerrero; Thomas Snell,

former vice president of Jose Cuervo; survey expert Robert Klein; marketing expert John

Kennard; brand expert Robert Frank; materials expert Robert Iezzi; alcoholic beverages expert

Steve Mutkowski; and damages expert Thomas Neches.

Diageo offered testimony from Rob Warren and the Court took various other testimony

by deposition. Additionally, the parties submitted post-trial briefs and responses.

## II.

As a preliminary matter, the Court must address the precise scope of the 465 trademark

Plaintiff asserts in this case. That mark protects a "wax-like coating covering the cap of the

bottle and trickling down the neck of the bottle in a freeform irregular pattern."[6] During the first

five or so years of this litigation, Maker's Mark's legal arguments referred to rights in a "free-

form" wax seal generally, and did not specifically mention the color red, though all its seals are

red.[7]  In other words, Maker's Mark appeared to be seeking protection for any dripping wax seal,

---

[6] The trademark asserted here protects the Maker's Mark package design, rather than the words "Maker's Mark," and thus constitutes "trade dress." The design of a product, as well as its packaging, both "trade dress," may form the basis of protection under the Lanham Act.  This is so whether or not the trade dress has been registered as a trademark on the principal register. *Fuji Kogyo Co. v. Pacific Bay Int'l., Inc.*, 461 F.3d 675, 683 (6th Cir. 2006)(citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209-10 (2000)); 15 U.S.C. § 1125(a)(3). However, when the packaging of a product satisfies the federal standards of trademark protection, it can be approved for placement on the principal register. *See, e.g., Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (1995)(green/gold color of a dry cleaning press pad); *Gibson Guitar Corp. v. Paul Reed Smith, LP*, 423 F.3d 539 (6th Cir. 2005) (two-dimensional silhouette of guitar's body shape). This path from trade dress to registered trademark is precisely the path Maker's Mark has followed. Thus, the Court will apply the statutory presumptions provided under the Lanham Act for registered trademarks. This is appropriate because the claims are pled as trademark infringement claims, rather than claims for unregistered trade dress infringement.

[7] Maker's Mark occasionally uses seals of other colors to commemorate certain events or for charitable purposes. However, the evidence showed that the company has applied non-red seals to less than one percent of its bottles.

regardless of color. However, in the months leading up to trial, Maker's Mark narrowed its arguments to assert protection only for a *red* dripping wax seal. Despite the fact that Maker's Mark owns the separate 813 trademark incorporating the color red on the neck of a whisky bottle, it has never asserted that trademark in this case.[8] Instead, Maker's Mark's assertion of the color red in the context of a dripping wax seal is based entirely on its continuous and regular use of that color, as one of the many colors permitted under the 465 mark.

Though Defendants argued that the belated focus on "red" prejudiced them, the Court allowed Maker's Mark to assert its rights in a red dripping wax seal because that color is such a fundamental, likely inseparable, element of the mark. Indeed, today's opinion addresses only the red dripping wax seal asserted in this case, and not any other seal potentially protected by the broader 465 mark. The Court declines to address, for instance, the validity or confusion issues concerning any trademark incorporating other colors of dripping wax. Those questions are not raised here because Maker's Mark does not typically use seals of other colors, does not assert protection for seals of other colors, and only challenges Cuervo's use of *red* dripping wax seals. Additionally, Maker's Mark's focus on *red* dripping wax actually narrows its trademark interests, rather than expanding them.[9] Thus, the trademark that the Court refers to throughout

---

[8] In July 2009, Plaintiff did move to amend its complaint to include an assertion that Defendants' current use of *non-dripping* red wax on the Reserva de la Familia product was also an infringement of its trademark rights. However, the proposed Amended Complaint also did not assert the 813 trademark in the color red. The Court denied Plaintiff's motion, in part because discovery had already closed and the amendment would have prejudiced the Defendants. Plaintiff then filed a new case challenging the use of Reserva's non-dripping red wax seal. That case is pending before the Court and does assert the 813 trademark.

[9] Cuervo argues that the addition of "red" into the case is actually a broader protection than Maker's Mark originally asserted, and that red is an additional and *unregistered* portion of Maker's Mark's trademark. In contrast, Maker's Mark asserts that the 465 trademark is unrestricted as to color and thus protects its use of red. *See In re Data Packaging Corp.*, 453 F.2d, 1300, 1302 (C.C.P.A. 1972) (holding that non-color-specific trademark envisions use of the trademark in "all the colors of the spectrum")(citation omitted). The importance of this distinction is that if the Court shared Cuervo's view, Maker's Mark would have had to prove that the unregistered portion, or red

this opinion is the Maker's Mark red dripping wax seal.

## III.

The first issue the Court will address is the validity of Plaintiff's trademark. Though the mark has become "incontestable" pursuant to 15 U.S.C. §1065, that status merely creates a presumption of validity, and does not bar certain statutory challenges. 15 U.S.C. §§ 1052(e)(5), 1119. Here, the Cuervo Defendants argue that a free-form wax coating cannot comprise a valid trademark, and seek cancellation of the 465 mark on the grounds that it is either functional or generic.[10] Because the mark is incontestable, Defendants bear the burden of proving these assertions.[11] *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 405 (6th Cir. 2002); *Fuji Kogyo Co.,* 461 F.3d at 683; 15 U.S.C. § 1115(a)(a registered mark is "prima facie evidence of the validity of the registrant's . . . exclusive right to use . . .").

### A.

Defendants argue the red dripping wax seal is functional because it protects a cork from air, moisture and contaminants, thus preserving the contents of the bottle on *some* bottles of alcohol. They further argue that drips are a natural byproduct of such a coating, and are costly to

---

portion, of its package design mark was "inherently distinctive" or had attained "secondary meaning" to get trademark protection for it. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769-70 (1992). However, even if Cuervo were correct, the ultimate result is unchanged, because the Court finds that Maker's Mark's red dripping wax seal is inherently distinctive and/or has attained secondary meaning through fifty years of consistent use, extensive advertising focused on the mark and an extremely strong association between the mark and the product by relevant consumers. The red dripping wax seal is clearly an indicator of source.

[10] The Cuervo Defendants also argued, in some pre-trial motions and in their post-trial brief, that Maker's Mark obtained its trademark fraudulently, by making material and false misrepresentations with the intent to deceive the U.S. Patent and Trademark Office. This claim fails because Defendants have offered absolutely no evidence of it.

[11] In a 1999 amendment to Lanham Act § 43(a), Congress added a paragraph placing the burden of proving non-functionality on the plaintiff in the case of *unregistered* trade dress. However, as noted above, Plaintiffs seek protection for a registered trademark that protects trade dress packaging.

remove.  On the other hand, Maker's Mark asserts that a liquid-tight twist cap, and not the more expensive trademark wax coating, protects and preserves its product.

The Supreme Court has said that a product is functional "if it is essential to the use or purpose of the article or when it affects the cost or quality of the article."  *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995).  The  role of competition is critical to the functionality analysis.  As the *Qualitex* court explained "[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."  *Id.*  at 164.  Consequently, even if the senior user's own use of the wax seal is not functional, the seal could be deemed functional if competitors need wax seals for a functional purpose on their own bottles.

Functionality in a trademark case is a factual determination. *Fuji Kogyo*, 461 F.3d at 681 (6th Cir.  2006) (citing *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1246 (6th Cir. 1991)).[12]   The Sixth Circuit has recently reviewed a district court's cancellation of a federally registered trademark in the shape of fishing rod lines on functionality grounds.  *Fuji Kogyo*, 461 F.3d 675. There, the district court found that the shape of the fishing rod lines was functional and cancelled the trademark registration.  *Id.* at 684.  In reviewing the district court's decision, Judge Boggs noted the Federal Circuit's "helpful doctrine" of *de jure* versus *de facto* functionality in assessing claims that a trademark is functional:

---

[12]*See* 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:73 *Evidence Relevant to the Functionality Issue* (4th ed. 2008) [hereinafter MCCARTHY] (noting, "[e]ach case of alleged functionality will present a unique set of facts not easily disposed of either by sweeping generalities or precise legal rules.  So long as the proper question is asked, the result will flow from a careful weighing of the evidence relevant to whether or not the disputed design feature is dictated by utilitarian purposes.").

> Our decisions distinguish *de facto* functional features, which may be entitled to trademark protection, from *de jure* functional features, which are not. "In essence, *de facto* functional means that the design of a product has a function, i.e., a bottle of any design holds fluid." *De facto* functionality does not necessarily defeat registrability. *De jure* functionality means that the product has a particular shape "because it works better in this shape."

*Fuji Kogyo*, 461 F.3d. at 685 (quoting *Valu Eng'g, Inc.,* 278 F.3d at 1274 (Fed. Cir. 2002) (citations omitted)(italics added). Here, the wax seal falls into Judge Boggs' *de facto* functionality category if the evidence shows that seals serve a function on some bottles, but that they are not a *superior* way to seal a bottle.

Additionally, the Sixth Circuit noted that the district court had adopted the *Morton-Norwich* test, which considers: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Fuji Kogyo*, 461 F.3d at 685 (citing *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982)).[13] Only the last two prongs of the test are relevant here.[14]

The most credible witnesses on functionality were James LeTourneau, a production

---

[13] This Court is aware that in *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 31 (2001), the Supreme Court held that "[i]f a design is functional, there is no need to further consider competitive necessity" and that the third and fourth *Morton-Norwich* factors consider alternative design and cost of manufacturing. The Sixth Circuit has yet to definitively resolve whether evidence of alternative designs has a place outside the competitive necessity test. *See Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 156 (6th Cir. 2003). Acknowledging that "a court is not *required* to examine alternative designs when applying the traditional test for functionality," *id.*, this Court is persuaded that the *Morton-Norwich* factors provide a helpful framework to evaluate the evidence regarding the functionality of a wax coating. Indeed, Judge Boggs' more recent application of the *Morton-Norwich* factors in *Fuji Kogyo* indicates to do so is not error in this Circuit. *See* 461 F.3d at 685.

[14] The first two prongs of this test do not apply because there are no patents at issue.

manager for Jim Beam Distillers; Kevin Smith, Master Distiller for Maker's Mark; Thomas Ryan, a bottle closure expert; and Barry Guihan, a wax expert. Collectively, these individuals convinced the Court that the closure mechanisms on distilled spirits bottles make additional protection unnecessary and that the wax serves no true protective or preservative function. They also identified other less-expensive means for creating tamper-proof closures. Their testimony convinced the Court that numerous functionally equivalent methods exist to seal a bottle; that dripping wax seals are not a comparatively cheap or simple method; that the wax on the Maker's Mark bottle serves no function; and that Maker's Mark did not intend for it to serve any function.

Moreover, in the Court's view, Cuervo completely failed to show that wax seals are functional. Not only did Cuervo fall short of proving that the wax seal on *the Reserva bottle* was functional, it also did not prove that *any* current wax seal users employ the method for a functional purpose. For example, Cuervo's production manager, Alfredo Guerrero, acknowledged that the company seals other Cuervo products with plastic caps or shrink wrap, and that some of those methods are less expensive than creating a wax seal. Cuervo's materials expert, Robert Iezzi, asserted that the cost of creating the straight seal was $26,000 more per year than the cost of creating the dripping wax seal. However, his testimony lacked credibility. He failed to factor in time required to create the dripping wax seal and may have inflated the time necessary to make the straight-edge seal. Some parts of his testimony conflicted with Guerrero's, indicating that Iezzi performed his experiments under circumstances that were materially different from ones Cuervo actually used when it created the Reserva's dripping wax seal.

In short, Defendants' witnesses did not offer any credible proof that Plaintiff's wax seal

is functional, and Plaintiff's evidence convinced the Court that the seal serves to identify the product's source.

B.

Defendants further argue that Plaintiff's use of the dripping wax should be considered functional under a separate legal theory – aesthetic functionality. The Supreme Court referenced this legal concept, as opposed to traditional functionality, in *TrafFix Devices v. Marketing Displays*, 532 U.S. 23, 33 (2001), saying that "it is proper to inquire into a significant non-reputation-related disadvantage in cases of aesthetic functionality." *See also Antioch Co. v. W. Trimming Corp.,* 347 F.3d 150, 155 (6th Cir. 2003) (citing *Qualitex*, 514 U.S. at 170) (the Supreme Court "proposed in dicta that where an aesthetic feature (like color), serves a significant function – such as helping an individual distinguish between a heart pill and a digestive tablet – courts should examine whether the exclusive use of that feature by one supplier would interfere with legitimate competition). Other circuits and treatises have questioned the aesthetic functionality doctrine. *See Antioch,* 347 F.3d at 155; *see also* MCCARTHY, *supra* note 12, §§ 7:79-7.82 *Aesthetic Functionality* (4th ed. 2008).

Nevertheless, the Cuervo Defendants argue that the Sixth Circuit would support their use of aesthetic functionality to invalidate Maker's Mark's trademark. *Abercrombie & Fitch Stores, Inc., v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 641 (6th Cir. 2002). The *Abercrombie* court noted that "the functionality doctrine may apply even to features of a product that are purely ornamental." *Id.* at 641 (citations omitted). It described a functional feature as "one which competitors would have to spend money not to copy but to design around ... . It is something costly to do without (like the hood [of a car] itself), rather than costly to have (like the

11

statue of Mercury [decorating the hood]). *Id.* at 642, n.17 (quoting *W.T. Rogers Co. v. Keene*, 778 F.2d at 339) (7th Cir. 1985). The court went on to say that "[i]t would . . . be unreasonable to let a manufacturer use trademark law to prevent competitors from making pleasing substitutes for his own brand; yet that would be the effect of allowing him to appropriate the most pleasing way of configuring the product." 778 F.2d at 346. Thus, applying the doctrine of aesthetic functionality is a matter of proof.

Even assuming that the Sixth Circuit would apply the doctrine, the Court finds the case for its application here is unpersuasive. None of Cuervo's witnesses, such as Alfredo Guerrero or Robert Iezzi, convinced the Court that it would be difficult or costly for competitors to design around the red dripping wax trademark. Furthermore, red wax is not the only pleasing color of wax that competitors may employ on their product, nor does it put competitors at a significant non-reputation related disadvantage to be prevented from using red dripping wax. There are other ways of making a bottle look artisinal or unique. Therefore, the doctrine of aesthetic functionality is inapplicable here.[15]

## C.

Defendants also argue that Maker's Mark's registered trademark is generic. A registered trademark that becomes generic may be cancelled at any time. The Lanham Act articulates this test for genericness: "The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used." 15 U.S.C. § 1064(3). "[T]he term 'generic name' as used in [Lanham Act § 14(3)] must

---

[15] Because the doctrine is not applicable, the Court declines to address the validity of the "aesthetic functionality" doctrine in this Circuit.

be read expansively to encompass anything that has the potential but fails to serve as an indicator of source, such as names, words, symbols, devices or trade dress." *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322 (Fed. Cir. 1999). As with functionality, federal registration constitutes a presumption that the feature is not generic and the challenger bears the burden of overcoming this presumption. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007).

Besides rather general testimony from several witnesses, only Robert Frank attempted to address the subject comprehensively. He found about a dozen brands of distilled spirits that had used a wax seal,[16] though many of those were not red or did not drip. This evidence did not come close to convincing the Court that red dripping wax was an ordinary or even widespread indicator for distilled spirits. It was simply not enough to show that red dripping wax seals are identified so closely with distilled spirits as to become generic.

From the foregoing analysis, the Court concludes that the red dripping wax seal is valid.

## IV.

Any analysis of Maker's Mark's trademark claims should begin with an examination of the goals underlying federal trademark law. Trademarks are unique designations that serve to "'identify and distinguish' the goods of a person." MCCARTHY, *supra* note 12, § 3.1 *What a trademark is* (4th ed. 2002)(quoting 15 U.S.C. 1127). The purpose of the trademark statutes is to protect the trademark holder's quasi-property interest in the mark and prevent consumer confusion about the actual source of goods using the mark. *Ameritech, Inc. v. American*

---

[16] There were six whiskies with black wax seals, three whiskies with red wax seals and a handful vodkas and tequilas that used wax seals. Maker's Mark has challenged uses of red wax on various whiskies, including at least one of the three identified by Robert Frank.

*Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir. 1987).

In this section, the Court will address Makers Mark's infringement claims under various federal and state laws.[17] These claims turn on whether Cuervo's use was likely to confuse consumers. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006)*(citing Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992)). In contrast, Maker's Mark's dilution claim, which the Court will discuss in Section V, does not focus on confusion, because dilution exists "to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." 469 F.3d. at 547.

A.

Section 32 of the Lanham Act imposes civil liability for "use in commerce [of] any ... copy, or colorable imitation of a registered mark in connection with the sale, offering for sale ... of any goods ... or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). Under Section 43(a), the relevant inquiry into a federal claim of unfair competition is whether Defendant:

> ... on or in connection with any goods ... or any container for goods, uses in commerce any ... symbol, or device or any combination thereof, or any false designation of origin ... which – (A) **is likely to cause confusion,** or to cause mistake, **or to deceive as to the affiliation, connection, or association ...** with another person, **or as to the origin, sponsorship, or approval of his or her goods** ... or commercial activities by another person ... .

---

[17] Courts apply the same analysis for Kentucky common law trademark infringement and unfair competition claims as they do for federal claims of trademark infringement. *See Winchester Federal Savings Bank*, 359 F. Supp. 2d 561, 564 (E.D. Ky. 2004)("Once the plaintiffs establish that the marks are valid and protectable, they must establish that the defendant's service mark is likely to cause confusion among consumers in the marketplace in order to prevail on all of the state and federal claims.")(citing *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir. 1983)). Federal false designation of origin claims are also resolved under this standard. 15 U.S.C. § 1125(a). Thus, the Court resolves all of the trademark claims, other than the federal dilution claim, in this section.

15 U.S.C. 1125(a)(1)(A).

## 1.

Thus, to prove trademark infringement, Maker's Mark must show that Defendant's use of a red dripping wax seal on its bottle of Reserva tequila is "likely to cause confusion" among consumers.[18] The Sixth Circuit recognizes at least three types of trademark infringement claims: confusion of sponsorship or affiliation, palming off and reverse confusion. *Therma-Scan v. Thermoscan, Inc.,* 295 F.3d. 623, 630 (6th Cir. 2002); *Ameritech,* 811 F.2d 964. Maker's Mark focuses on confusion of sponsorship, where the goods may or may not be directly competitive, but the similarity of the trademark erroneously suggests a connection between the sources and the junior user seeks to capitalize on the senior user's goodwill or reputation.[19]

The Sixth Circuit has adopted an eight-factor test – "the Frisch factors" – for determining

---

[18] Defendants argue that in order to make out a viable "likelihood of confusion" claim, Maker's Mark must prove that its trade dress has acquired secondary meaning. While it is true that Sixth Circuit opinions analyzing trade dress confusion claims identify a three-part test for trade dress infringement – which requires, in addition to likelihood of confusion, that a plaintiff show its mark is non-functional and has attained secondary meaning – the Court finds the secondary meaning step inapplicable in a situation where Plaintiff's trade dress was registered as a trademark and has become incontestable. *See GMC v. Lanard, Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006)(court applies three-part test, including secondary meaning element, to unregistered trade dress is at issue, but does not apply that test to the registered trademarks at issue, even where those trademarks protected trade dress elements, such as the nose design of a Hummer); *see also Audi AG*, 469 F.3d at 539-45 (applying the likelihood of confusion test alone when one of the marks was registered trade dress). Though the determination of secondary meaning or distinctiveness could be relevant under the first *Frisch* factor – strength of the senior mark – the Court does not need to address it outside the *Frisch* test.

[19] The traditional and most prevalent type of infringement claim is so-called "palming off," where the plaintiff's and defendant's goods are in direct competition and the confusion is over the source of their origin. *Ameritech,* 811 F.2d at 964. In other words, consumers might buy the infringing, or junior user's, product, after mistaking it for the senior user's product. *Id.* Here, Plaintiff does not assert that anyone would actually buy the Reserva believing that it was a bottle of Maker's Mark.

A third type of trademark infringement is called "reverse confusion," which occurs when "the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter." *Id.* Maker's Mark did make reference to "reverse confusion" in its post-trial briefs. However, the Court does not address the theory, because the proof at trial simply did not support it. Maker's Mark offered no evidence that Cuervo had the ability or the intent to saturate the market with its $100 Reserva product. Should that circumstance to change, it would implicate an entirely new set of issues.

15

whether consumers are likely to be confused: (1) strength of the senior mark; (2) relatedness of the goods and services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used, (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *See Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). Courts use the *Frisch* factors regardless of the type of claim, though the significance of each factor may be different in an association claim than in a palming-off claim. *Therma-Scan,* 295 F.3d. at 630.

2.

To analyze consumer confusion, one must first identify the relevant pool of consumers. Maker's Mark contends that confusion of potential buyers of either product is relevant, while Cuervo insists that only potential buyers of Reserva should be considered. The circuits are split on this issue. The Fifth Circuit has said that in a trademark infringement action where a survey is used "the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Scott Fetzer Co. v. House of Vacuums*, Inc., 381 F.3d 477, 487-88 (5th Cir. 2004)(internal quotation marks omitted). In contrast, the Second Circuit found that it was error for a district court to consider only likely confusion of customers of the junior user and exclude customers of the senior user. *Yarmuth-Dion v. D'ion Furs*, 835 F.2d 990, 995 (2d. Cir. 1987). The Sixth Circuit has addressed the issue only tangentially, when affirming a district court's criticism of a survey that included too broad a spectrum of purchasers. *Leelanau*, 502. F.3d at 518. It cited the Fifth Circuit case with approval when it said "[t]he district court correctly recognized that the [confusion] study failed to limit the respondent population to those persons likely to purchase defendant's products." *Id.* (citing *Fetzer*, 381 F.3d

16

at 487-88).

This Court agrees with the Sixth Circuit's apparent endorsement of the view that the relevant consumers are the potential buyers of the junior user's product. This limitation is sensible. Maker's Mark is not harmed if its own consumers believe there is an association between Maker's Mark and the Reserva but would never purchase Reserva based on that connection. Therefore, the Court will consider only the confusion of potential Reserva consumers.[20]

B.

With the foregoing principles in mind, the Court will examine each of the *Frisch* factors separately and then draw broad conclusions. "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. ... The ultimate question remains whether the relevant consumers are likely to believe that the products or services are affiliated in some way." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997).

1.

**Strength of the Senior Mark:** "A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Daddy's,* 109 F.3d 275, 280 (citation omitted). The Sixth Circuit has noted that "[t]he stronger the trademark, the more likely it is that encroachment on it will produce confusion." *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1117 (6th Cir. 1996) (citation omitted).

---

[20] Clearly, some of these consumers could also be potential or actual consumers of Maker's Mark.

17

The Court considers the red dripping wax seal inherently distinctive, because it is a unique mark used in an usual way to draw in the consumer.[21] Plaintiff's marketing efforts have enhanced its distinctiveness. For example, Maker's Mark spends $22 million annually on marketing that focuses almost entirely on branding the red dripping wax. That advertising spans various mediums, from stadiums and subway stations, to billboards and buses, to newspapers and magazines. Because of the unique nature of the advertising's focus on the red wax, the mark has in some ways taken on a life of its own, garnering significant attention beyond the purchased advertising.[22] Dozens of periodical references to the red wax, including mentions in *BusinessWeek*, the *Wall Street Journal*, the *Atlanta-Journal Constitution* and the *Associated Press*, support the distinctive nature and success of the trademark branding effort.[23]

Beyond that extensive paid and free publicity, Maker's Mark also grew its brand in other ways, such as on-site dipping stations, ambassador programs where enthusiasts encourage others to try the product and bartender training. These efforts have cultivated something akin to a cult

---

[21] When determining whether a mark is unique or distinctive, courts often place a trademark into categories: generic, descriptive, suggestive, and fanciful or arbitrary. *Daddy's*, 109 F.3d at 280. However, such categories are not as helpful in packaging-related trade dress claims as they are when assessing the strength of a word mark. Thus, in trade dress claims (at least those not dealing with product design), courts typically look to whether the trade dress is either 1) inherently distinctive, or 2) has acquired distinctiveness through the attachment of "secondary meaning." *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 635-39 (6th Cir. 2002); *see also Two Pesos, Inc., v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992). Though the mark at issue is inherently distinctive, the Court finds that it has also acquired secondary meaning through fifty years of use, extensive advertising and consumer recognition.

[22] For instance, Maker's Mark received national advertising awards for its unique, wax-focused ad campaigns. Additionally, the company offered evidence at trial that various movie and television producers had contacted it for permission to use the mark in their films or shows. For example, the red wax appeared in three recent Spiderman movies and on the show "Sex in the City."

[23] Three years ago, *BusinessWeek* called to the dripping wax seal as "one of the most recognizable branding symbols in the world." *The Atlanta-Journal Constitution* referred to the "famous red wax seal" in an article from 2002. In 2008, the *Associated Press* called Maker's Mark an "internationally known bourbon with a distinctive red wax seal." That same year, *CBS Sunday Morning* did a story on Maker's Mark and followed a bottle through the "famous dip in red sealing wax."

following of the brand among whisky enthusiasts. For example, an internal Jim Beam study measuring brand awareness showed that one in five whisky drinkers demonstrated an "unaided awareness" of Maker's Mark. According to the firm performing the study, those numbers were relatively high, "suggesting that for a smaller, more niche brand, [Maker's Mark] is potentially getting higher levels of 'talk' than might be expected for its size."[24] The study also found that 69 percent of whisky drinkers and 57 percent of distilled spirits drinkers were familiar with the brand.

Cuervo counters this evidence by arguing that wax seals are commonplace in the distilled spirits industry, and therefore Plaintiff's mark cannot be a strong mark. Though Defendants' brand expert Robert Frank did show some limited use of wax seals on distilled spirits, he did not convince the Court that it was commonplace. Furthermore, the relevant trademark here is a red dripping wax seal, and Maker's Mark has near exclusive use of such a mark among the relevant consumers.

The Court is convinced that the Maker's Mark red dripping wax seal is an extremely strong mark due to its unique design and the company's singular marketing efforts. This factor is particularly important in the analysis here for two reasons: (1) trademark laws are designed, in part, to protect creativity, brand identification and brand design loyalty, and (2) the more well-known the trademark is, the more likely it is that potential Reserva consumers will recognize it and assume its use indicates an affiliation or association with Maker's Mark.

2.

**Relatedness of the Goods:** "Cases typically fit into one of three categories regarding the

---

[24] Plaintiff's Exhibit No. 165, p. 8533.

relatedness of the goods and services of the parties. First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely." *Daddy's,* 109 F.3d at 282. "Services and goods 'are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* at 282-83 (citing *Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1109 (6th Cir. 1991).

The Sixth Circuit has held the following goods or services related enough to cause confusion: bulk car wash products and car wash franchises, two slightly different kinds of oxygenating septic filters and sit-down and carry-out pizza. *See Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797 (6th Cir. 2004)(superceded on other grounds)(collecting cases).[25] Other businesses were not related enough, including infrared thermal-imaging devices and ear thermometers, real estate brokers and marketing services for real-estate brokers and Kellogg cereal's "Toucan Sam" trademark and a golf company named "Toucan Golf." *Id.*

Here, the evidence shows that the products are part of the same broad category of high-end distilled spirits and Maker's Mark offered limited evidence that Cuervo intended to market the Reserva to drinkers of single barrel bourbons or other distilled spirits. Regardless, a certain unquantifiable number of Reserva's consumers are likely among those who also know of or consume Maker's Mark, simply because distilled spirits drinkers tend to graze among different

---

[25] Some of these courts did not ultimately find a likelihood of confusion, for various reasons.

brands. Cuervo points other factors to show the goods are less related. For instance, Maker's

Mark is a premium bourbon whisky, retailing for about $24 a bottle, while Cuervo's Reserva is

an "ultra" or "super" premium tequila selling for about $100 a bottle. Though the price

difference in the two products does influence the Court's decision, it is not as relevant in an

association case as it is would be in a palming off case, because potential Reserva consumers

might believe a distilled spirits producer would sponsor or affiliate with a product in a different

price range.

Thus, the Court finds that the products are somewhat related, but are not directly

competitive. This  factor marginally favors Maker's Mark.

3.

**Similarity of the Marks:** This factor carries considerable weight. *Daddy's,* 109 F.3d at

283.  "The appearance of litigated marks side-by-side in the courtroom does not accurately

portray market conditions." *Id.* at 283 *(*citing *Homeowners Group,* 931 F.2d at 1106).  "Rather,

courts must determine whether a given mark would confuse the public when viewed alone, in

order to account for the possibility that sufficiently similar marks 'may confuse consumers who

do not have both marks before them but who may have a general, vague or even hazy impression

or recollection' of the other party's mark." *Daddy's*, 109 F.3d at 283 (citing *Wynn Oil Co. v.

Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988) (citation omitted)). Courts should view marks in

their entirety and focus on overall impressions rather than individual features. *Daddy's*, 109 F.3d

at 283 (citing *Homeowners Group*, 931 F.2d at 1109).  The Court deems this factor particularly

important in an association case, where the mark could be the only indicator that there is a link

between the two products.

The competing cases of red wax have obvious facial similarities. The neck of the Maker's Mark bottle is topped with a glossy, red wax seal that covers the cap and drips, in a freeform fashion, down the glass neck. The front label of the bottle says "Maker's Mark" and includes the family's "S IV" seal. Reserva's dripping wax also covers the cap and drips down the neck and is almost the same color red. The two bottles are nearly the same height and the liquid in both appears brown. On closer examination, in the manner of a potential consumer, the Reserva wax seal is notably different. Its wax is thinner and less glossy. It is imprinted with the Cuervo family seal and a small blue ribbon protrudes from beneath the wax. Overall, the Cuervo dripping wax creates a distinctly more antique look than the clean, contemporary feel of the Maker's Mark wax. Very few consumers, if any, would buy one product believing it was the other.

Cuervo urges the Court to give the house marks – the "Jose Cuervo" and "Maker's Mark" labels – significant weight in considering overall similarity. Sixth Circuit cases properly acknowledge that the presence of a house mark, along with the alleged infringing trademark, can decrease the likelihood of confusion. *Therma-Scan,* 295 F.3d. at 634; *Autozone*, 373 F.3d at 796-97. Though a house mark would be important in a "palming off" case, it does not logically follow that house marks would be as important in an association case, when the two products are related enough that one might associate with or sponsor the other and still use their own house mark. That said, the Court does acknowledge that nothing on the products *other than* the red dripping wax, would suggest an association between the two.

Overall, in the context of a confusion of sponsorship case, the facial similarity of the Reserva and Maker's Mark seals causes this factor to narrowly favor Maker's Mark.

4.

**Evidence of Actual Confusion:** "Evidence of actual confusion is the best evidence of likelihood of confusion," *Daddy's*, 109 F.3d at 283 (quoting *Wynn Oil*, 839 F.2d at 1188). But because it is difficult to show actual confusion, "a lack of such evidence is rarely significant." *Daddy's*, 109 F.3d at 283. Parties typically show actual confusion through direct evidence from or about communications with consumers or through consumer surveys. *See Daddy's*, 109 F.3d at 284 (consumer called plaintiff and indicated his belief that a store owned by defendant was plaintiff's store); *Therma-scan*, 295 F.3d at 624 (e-mails from consumers indicating uncertainty about whether plaintiff manufactures thermometers); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 502 F.3d 504, 517-18 (plaintiff offered confusion survey).

At trial, Maker's Mark offered Marketing Director Barry Younkie to testify about a few, non-specific instances of alleged actual confusion at WhiskyFest.[26] To the extent that Younkie's testimony was evidence of actual confusion, it was weak because it came from an interested party and lacked the detail necessary for the Court to determine whether the consumers were potential purchasers of Reserva. *See Therma-Scan*, 295 F.3d at 634 (finding that six e-mails indicating uncertainty about the plaintiff's products was not significant evidence of actual confusion); *Homeowners Group*, 931 F.2d at 1110 ("it does not follow that any type or quantum

---

[26] Younkie testified that at WhiskyFest – an event where liquor producers, including Maker's Mark and Cuervo, set up booths and make presentations – some consumers questioned him about the relationship between Maker's Mark and Reserva. Younkie indicated that he was standing at his booth when "consumers came up and said, 'Since when did Maker's Mark do a licensing agreement with Cuervo? Now you've got a tequila? What does it taste like? Are you using your barrels?' And I didn't know what they were talking about." Younkie further testified that other Maker's Mark fans, angered by Cuervo's use of the red wax seal, approached him to tell him that "Cuervo has stolen your dripping wax."

of such evidence is entitled to significant weight").[27] Almost all of the other purported

"confusion" evidence at trial consisted of testimony by Maker's Mark officials that concerned or

angry fans had contacted them to complain about Cuervo's use of the red dripping wax. This

evidence does not constitute "actual confusion." Rather, it shows that some consumers were

concerned about infringement *but were not confused*, and certainly were not buying the Cuervo

product because of an alleged association with Maker's Mark.

Cuervo offered the survey evidence of Robert Klein to show that confusion did not exist.

Klein concluded that only two percent of respondents were confused about the two brands. In

the Court's view, the study and its conclusions were flawed in several significant ways.[28] First,

the survey – conducted online using 500 respondents – created an environment that was

dissimilar to that in which a typical consumer would encounter Maker's Mark or Reserva.

*Leelanau, 502 F.3d at 518* (refusing to give credence to survey that "did not replicate conditions

that consumers would encounter in the marketplace"); *see* McCARTHY, *supra* note 12, § 23:2.50

at 23-16 (surveys are only evidence of actual confusion where "the survey mirrors the real world

setting" that creates an instance of actual confusion). Second, Klein showed the respondents

---

[27] Plaintiffs also offered an affidavit from memorabilia collector Jim Duncan, which stated that he saw the Reserva at WhiskyFest and initially thought it was a Maker's Mark product, but quickly realized his error. At most, this testimony constitutes "initial-interest confusion" which has been criticized in a Sixth Circuit trade dress case involving product design. *Gibson Guitar Corp., v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549-52 (6th Cir. 2005). It is not clear whether initial-interest confusion is viable as a substitute for actual confusion in a *package* design case such as this one. However, even if this were evidence of actual confusion, it is weak evidence in that it only involves one consumer who may or may not be a potential purchaser of Cuervo.

[28] Other courts have criticized Klein's surveys. *Bd. of Regents v. KST Elec., Ltd.*, 550 F.Supp. 2d 657, 676-77 (W.D. Tex. 2008) (Klein asked leading questions and coded survey responses in a way that favored Defendants) (citing *Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F.Supp. 2d 482, 299 (E.D. Pa. 2007) ("The Court finds that [Klein's] survey's use of the 'classic' control suffers from a significant shortcoming that limits its probative value in showing a likelihood of confusion between the brands.").

pictures of various liquors with the brand name listed below each product, which would tend to suggest that the products were not affiliated. Third, Klein's control group was problematic and may have skewed the confusion results.[29] Last, Klein excluded respondents who indicated that the products were related but said that they were "guessing." In sum, Klein's study was neither useful nor persuasive.

For the reasons stated above, the Court finds that neither party produced meaningful evidence related to actual confusion. The Sixth Circuit has held that "[t]he factor of actual confusion 'is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.'" *Daddy's*, 109 F.3d at 283 (citations omitted). Cuervo asserts that where, as here, the products co-existed for a number of years, evidence of actual confusion should have been available, if in fact it existed. While this is true in the abstract, the limited sales of Reserva with the dripping wax seal between 2001 and 2004 would make evidence of any actual confusion quite scarce. Consequently, the actual confusion evidence factor neither helps nor hurts Maker's Mark; it is neutral.

5.

**Marketing channels used by the parties:** A court must "consider 'the similarities or differences between the predominant customers of the parties' respective goods or services' and 'whether the marketing approaches employed by each party resemble each other.'" *Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006) (citing *Daddy's*, 109 F.3d at 285).

Maker's Mark sells its products in bars, restaurants and liquor stores. The nature of

---

[29] In that group, he replaced the picture of the Reserva at issue with another picture of Reserva that included a red wax seal but had no drips. Then, he subtracted the number of confused respondents in the control group from the number of confused respondents in the test group. Such an approach ignores the fact that the control group picture could have been confusing also.

Cuervo's packaging suggests a greater focus on liquor store sales. Maker's Mark presented some evidence at trial that Reserva's target market includes whisky drinkers. Certainly, the two show up at some of the same events, such as WhiskyFest, and advertise in some of the same magazines, including *Cigar Aficionado*. However, no evidence suggests that the two products are ever sold or appear side-by-side.

Maker's Mark's and Reserva's dramatically different advertising budgets limit the amount of overlap between their marketing channels. For example, Maker's Mark spends approximately $22 million annually marketing its bourbon, while Cuervo spends only a half million (as compared to its $100 million overall brand budget) on Reserva. Maker's Mark focuses its marketing on its red wax tendrils and Reserva does not. Also, the price difference in products suggests that Reserva appeals to connoisseurs. At most, Maker's Mark showed that there was some overlap in the customer base and marketing focus.

Cuervo produced evidence that Reserva is sold in different parts of the store than Maker's Mark and that it is sometimes sold in a locked case. This evidence is mostly irrelevant in a sponsorship or affiliation scenario, because it does not tend to prove less confusion as to Reserva's sponsorship or affiliation with Maker's Mark. In some ways, it would make sense for Maker's Mark to sponsor or affiliate with a product in a different price range, rather than a directly competitive product.

The Reserva is sold in a wooden box container that hides the bottle within and, therefore, reduces the possibility of confusion at the point of sale. However, at least some of the boxes are adorned with a cut-out picture of the bottle, red dripping wax seal included, and Maker's Mark offered evidence that retailers sometimes display Reserva on their shelves without the box. Thus,

the evidence about the impact of the box was mixed.

The marketing channels used by the parties are similar in some ways and dissimilar in others. Perhaps this factor marginally favors Maker's Mark.

6.

**Likely degree of purchaser care:** In the Sixth Circuit, the standard of purchaser care in trademark cases is a "typical buyer exercising ordinary caution." *Homeowners Group*, 931 F.2d at 1111. That court went on to say:

> However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Id.*

Potential purchasers of Reserva are likely to display a high degree of care because the Reserva is a relatively expensive liquor – the $100 price tag alone mitigates against a casual purchase. The Reserva purchaser is also likely to be sophisticated, because Reserva is an ultra-premium product that would tend to appeal to connoisseurs. Additionally, those who buy Reserva are likely to be knowledgeable about the Cuervo brand and, therefore, less likely to confuse it with others. Moreover, those Maker's Mark afficionados who do purchase Reserva are likely to know that their favorite brand sells no other kind of liquor and, therefore, is unaffiliated with Cuervo.

True, the high degree of care does not, by itself, preclude the possibility of confusion as to the association between the products. *See Daddy's,* 109 F.3d at 286 ("[C]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument

that he is buying to assume nonetheless that he seller is affiliated with or identical to the other party.")  Nevertheless, this factor clearly favors Cuervo.

7.

**Defendant's intent in selecting the mark:**  "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity."  *Daddy's* 109 F.3d at 286 (citing *Homeowners Group*, 931 F.2d at 1111).  Cuervo originally chose a mark that included a red wax top but no tendrils.  Witness testimony indicated that the tendrils arose organically, when Juan Domingo Beckmann, now the company president, saw a bottle of Reserva before the tendrils were cut and decided he liked the look.  Additionally, Cuervo ceased the allegedly offending use in the U.S. shortly after Maker's Mark sued for infringement. This evidence suggests that Cuervo's actions were benign.

Maker's Mark argues that extensive advertising of a protected mark can create a presumption that the alleged infringer knew of the protected mark, and that the use was intentional.  *See Daddy's,* 109 F.3d 275 at 286.  However, Maker's Mark was not as well known (and less well known in Mexico) when the Mark was first conceived, and Cuervo employees testified that they did not consider their use an infringement because the wax seals were used on different products. Additionally, in light of the huge size differences of the two companies, the Court is not convinced that it would make sense for Cuervo to try to associate with Maker's Mark when it already had so much brand recognition.

The Court finds that the evidence was not sufficient to prove that Cuervo's use was intentional. Because "intent is an issue whose resolution may benefit only the cause of the senior user, not an alleged trademark infringer," this factor is neutral. *Leelanau,*, 502 F.3d at 520 (citing

*Daddy's*, 109 F.3d at 287).

8.

**Any likelihood of expansion of the product lines**: "[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's,* 109 F.3d at 287 (citing *Homeowners Group*, 931 F.2d at 1112). Here, Maker's Mark only sells one product and does not plan to expand. Though there is some possibility that Cuervo, with its many brands, could make an entree into the bourbon market, it does not have plans to do so at this time. This factor is neutral.

C.

The question of  infringement is a close call. A majority of the *Frisch* factors do favor Maker's Mark. Only the strength of the mark, however, strongly favors Maker's Mark. Two other important factors, such as the relatedness of the goods and similarity of the marks, are marginally favorable. Nevertheless, these three factors taken together are quite significant.

The products occupy the same general market and liquor companies use co-branding frequently enough to lead consumers to believe that the red dripping wax could indicate a relationship between the two products. Additionally, the similarity of the marks leads the Court to believe that potential purchasers of Reserva could be confused, despite a heightened level of care. This is true especially where, as here, Maker's Mark has almost exclusively focused its marketing efforts on tying its distinctive brand identifier to its only product. This is precisely the circumstance under which trademark protection is most appropriate. For all these reasons, the Court concludes that Cuervo's use of a red dripping wax seal is likely to cause confusion among

the relevant consumers.

## V.

In addition to infringement, Maker's Mark argues that Cuervo's use of a dripping red

wax seal constitutes federal trademark dilution under the Trademark Dilution Recovery Act

("TDRA"). 15 U.S.C. 1125(c)(1). Under the TDRA,

> the owner of a famous mark that is distinctive, inherently or through acquired
> distinctiveness, shall be entitled to an injunction against another person who, at any
> time after the owner's mark has become famous, commences use of a mark or trade
> name in commerce that is likely to cause dilution by blurring or dilution by
> tarnishment of the famous mark, regardless of the presence or absence of actual or
> likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c). Instead of focusing on consumer confusion, trademark dilution inquires

whether a senior user's distinctive and famous mark is being diluted by another's use of a similar

mark that weakens the strength or damages the reputation of the senior mark. *See Jet, Inc., v.*

*Sewage Aeration Systems*, 165 F.3d 419, 42 (6th Cir. 1998).

The Sixth Circuit employs a five-part test for dilution. *Audi AG v. D'Amato*, 469 F.3d

534, 547 (6th Cir. 2006) (citing *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir.

2004)). To prevail on its claim, Maker's Mark must prove that (1) its mark is famous, (2) its

mark is distinctive, (3) the defendant used the mark in commerce, (4) after it became famous,

and (5) the defendant's use is likely to cause dilution of the plaintiff's mark. *Id.*

Though the dilution and infringement tests include some overlapping elements, the two

claims differ in critical respects. To prevail on a dilution claim, the parties *need not be*

*competitors* and confusion *need not be present. Jet, Inc.,* 165 F.3d at 425 ("Anti-dilution laws

protect a senior user's mark even if the junior user is not a competitor and there is no likelihood

of confusion between the two products. However, the senior user must demonstrate that it has a

famous mark and that the junior user's conduct damages the senior's interest in the mark 'by blurring its product identification or by damaging positive associations that have attached to it.")(citing *Ameritech, Inc. v. American Info. Technologies Corp.*, 811 F.2d 960, 965 (6th Cir. 1987)(applying Ohio law).

A.

Whether a mark is "famous" is the threshold issue in a trademark dilution claim. "Fame" is a lexicon of art particular to trademark jurisprudence; it is not at all the same as asking "the man on the street" whether a name, mark or product is "famous." It is not proven through the words of trade publication articles declaring it so.[30] Rather, under the TDRA, a mark is famous if it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. §1125(c)(2)(A). The term "general consuming public," added in a 2006 revision to the Act,[31] appears to have eliminated any possibility that niche fame – a type of fame recognized prior to 2006 – is a valid basis for finding a mark famous. *Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.,* 509 F.3d 380, 384 (7th Cir. 2007); *Bd. of Regents v. KST Elec., Ltd.,* 550 Supp.2d 657, 678 (W.D. Tex. 2008). The revision also indicates that Congress intended for dilution to apply only to a small category of extremely strong marks.

The TDRA lists four factors for courts to consider when determining whether a mark is famous:

(i) The duration, extent, and geographic reach of advertising and publicity of the

---

[30] See *supra* note 23.

[31] The previous version of the federal trademark act, prior to the 2006 revision, was called the Federal Trademark Dilution Act of 1995, or "FTDA." Some courts still refer to the revised act as the FTDA.

mark, whether advertised or publicized by the owner or third parties;
(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark;
(iii) The extent of actual recognition of the mark;
(iv) Whether the mark was registered ... on the principal register.

15 U.S.C. §1125(c)(2)(A).[32]

At trial, Maker's Mark offered strong evidence related to the first factor, which inquires into advertising and publicity of the relevant mark. Though Maker's Mark's national advertising budget is much smaller than the better-known Cuervo brand, the $22 million it does spend is primarily used to promote the dripping red wax. Furthermore, third party publicity from movies and newspapers gives Maker's Mark an additional boost under the first factor.[33] The fourth factor – whether the mark is a registered trademark – also favors Maker's Mark. However, Maker's Mark did not offer much evidence supporting the other two factors. While annual sales of 800,000 cases is somewhat significant, Maker's Mark is not the nation's largest whisky producer and its sales do not make it a behemoth in the distilled spirits world. Additionally, the lack of survey evidence leaves the Court with little to rely on as to the third factor – the extent of actual recognition of the mark. Fame in the trademark context must be based upon evidence and case law, not upon the personal opinion of industry commentators.

Since the revision to the trademark dilution act, courts have deemed famous brands such as Nissan, Nike and Pepsi. *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 2007 U.S. Dist.

---

[32] The TDRA also requires that the mark in question be famous at the time the offending use began. However, Maker's Mark only requests injunctive relief under the TDRA for Cuervo's *prospective* use of a red dripping wax seal, because the company has previously ceased use of the seal pending the results of this litigation. As such, Maker's Mark asserts that only its current or future fame – at the time Cuervo reissues its red dripping wax seal – is at issue. For purposes of this dilution analysis, the Court gives Plaintiff the benefit of the doubt by analyzing fame at the current time. However, its ultimate conclusions render moot the debate about the time of fame.

[33] See *supra* note 22.

LEXIS 90487 (C.D. Cal. 2007); *Nike, Inc., v. Nikepal Int'l, Inc.*, 2007 U.S. Dist. LEXIS 66686 (E.D. Cal. 2007); *Pepsico, Inc., v. #1 Wholesale, LLC*, 2007 U.S. Dist. LEXIS 53768 (N.D. Ga. 2007). The Sixth Circuit found that the Audi name and its trade dress were famous. *Audi AG*, 469 F.3d at 547. An opinion in this judicial district held that the Victoria's Secret name is famous. *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 743 (W.D. Ky. 2008). However, fame was not a contested issue in either the *Audi AG* or the *V Secret* case, and those opinions did not discuss the issue in any depth or length. Indeed, few courts have addressed the issue of fame in the context of trade dress. In one rare opinion that did, an Eastern District of Michigan court found that the Hershey Company candy bar's trade dress – consisting of the rectangular shape, silver foil and lettering and brownish-maroon wrapper – was famous. *Hershey Co. v. Art Van Furniture, Inc.*, 2008 WL 4724756 (E.D. Mich. 2008).

In contrast, a district court in Texas held that the Texas Longhorn logo was not famous for the purposes of the TDRA, even though it was well known within its niche market and was seen by millions of viewers during nationally televised sporting events. *Board of Regents, University of Texas System v. KST Electric, Ltd.*, 550 F.Supp. 2d 657 (W.D. Tex. 2008). A Maryland district court found that MENSA was not a famous mark, noting that a famous mark must be a "household name" and that the "TDRA does not 'protect trademarks whose fame is at all in doubt.'" *Am. Mensa, Ltd. v. Inpharmatica, Ltd.*, 2008 U.S. Dist. LEXIS 99394 (D. Md. 2008) (citations omitted). All in all, these cases do not give the Court much specific collective guidance.

Assuming for the moment that the Maker's Mark red wax seal is better known on a national level than MENSA and the Texas Longhorn logo, the company did not offer – and

probably could not offer – evidence that it is in the same league as Nike, Pepsi, Nissan, Audi, Hershey's or Victoria's Secret. Some of those brands enjoy not only a strong national presence, but also a significant international presence. Nike and Victoria's Secret have their own brick-and-mortar retail stores. The Hershey's name and trade dress is synonymous with chocolate. Usually, market dominance tracks fame. Though Maker's Mark is a terrifically strong and focused brand, the evidence here does not persuade the Court that it is in the same category as those above. In short, the Court has serious doubts.

Maker's Mark's proof did little to assuage the Court's concerns. Even though it offered evidence that numerous newspaper articles referenced the fame of its mark, general media assertions and acclamations of fame are not strong evidence that the mark is famous under TDRA's particular and high standard. Additionally, none of Maker's Mark's studies focused on fame among the general consuming public – rather they all viewed fame from a niche market perspective. As discussed above, niche fame is not sufficient.

Furthermore, Maker's Mark Marketing Director Barry Younkie all but conceded that the company's name – as distinguished from its mark, which is at issue in dilution – may not be famous even within the company's niche market of whisky drinkers. At trial, Younkie testified about a survey measuring awareness among whisky drinkers of the names of various distilled spirits brands. The survey showed that numerous brands, including Bacardi, Jack Daniels, Jim Beam, Cuervo, Absolut and others, were more recognized than Maker's Mark – which had a 69 percent awareness level.[34] In response, the Court asked the witness: "[C]an you draw the conclusion from this that Maker's Mark is not as famous as about 20 other brands of distilled

---

[34] Plaintiff's Exhibit 165, p. 8535.

spirits?" Younkie answered: "Yes, you could." Even though the survey focused on the *name* Maker's Mark, rather than recognition of the red wax seal, one could assume that Maker's Mark's red wax seal is not widely known among the general consuming public if the recognition of its name among whisky drinkers *alone* is only 69 percent.

Most of the cases concerning fame have addressed the issue more as an afterthought. This Court has addressed the issue more vigorously. The admitted parochial pride of many Kentuckians in this brand's success is not a substitute for actual evidence. The evidence in this case has not convinced the Court that Maker's Mark is famous as defined by the TDRA. Without proof of fame, Maker's Mark's dilution claim fails.

## VII.

Maker's Mark requests two separate statutory remedies for Cuervo's infringement. First, it seeks a permanent injunction prohibiting Cuervo from future use of the red dripping wax. 15 U.S.C. § 1116(a). Second, Maker's Mark argues that it deserves an award of money damages in the form of a reasonable royalty to compensate it for Cuervo's past use. 15 U.S.C. § 1117(a).

An injunction of some sort is the typical remedy in a trademark infringement case. *See Audi AG*, 469 F.3d at 550. Such relief provides tangible evidence of the trademark holder's rights, and arms the holder with a legal weapon by which it can fend off infringing use. In contrast, monetary damages are designed to compensate the victim for lost sales, to rectify unjust enrichment or to deter future use. *See e.g.* MCCARTHY, *supra* note 12, § 30:58-59 (4th ed. 2008); *Nalpac, Ltd., v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir. 1986)(monetary damages may be awarded where defendant acts in bad faith); *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968)(monetary awards can deter defendant and compensate

for unjust enrichment). Monetary damages are not automatically recoverable, even where a plaintiff succeeds in proving infringement. *Audi AG v. D'Amato*, 381 F. Supp. 2d 644 (E.D. Mich. 2005), *aff'd*, 469 F.3d (6th Cir. 2006).

The Court will address each request in turn.

A.

Section 35 of the Lanham Act permits courts to grant injunctions "according to the principles of equity and upon such terms as the court may deems reasonable, to prevent the violation of any right" of the holder of a registered or unregistered trademark. 15 U.S.C. §§ 1116(a), 1117(a). In the Sixth Circuit, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Audi AG*, 469 F.3d at 550 (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)). A plaintiff seeking a permanent injunction must show that (1) it has suffered irreparable injury, (2) there is no adequate remedy at law, (3) a remedy in equity is warranted when considering the balance of hardships between the parties, and (4) it is in the public's interest to issue the injunction. *Audi AG*, 469 F.3d at 550 (citing *eBay Inc., et al. v. MercExchange, LLC*, 126 S. Ct. 1837, 1839 (2006)).

1.

Generally, irreparable injury, the first factor, is presumed from a showing of success on the merits of a trademark infringement claim. *See DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 208 (6th Cir. 2004); *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999). As to the second factor, equitable relief is probably the surest way to prevent further consumer confusion between the two red dripping wax seals as well as emphasizing and

protecting Maker's Mark's rights. When considering the third factor – the hardships of such a remedy – Maker's Mark's concerns seem to be much greater than Cuervo's. Over many years, Maker's Mark has expended considerable amounts of money and effort building consumer association between the red wax seal and its bourbon. Cuervo has put little effort into marketing Reserva and the red dripping wax seal on its bottle. Moreover, allowing the wax to drip was an afterthought and Cuervo discontinued its use shortly after this lawsuit began. Finally, under the last factor, it is in the public's best interest to be certain that consumers are not misled in the future. *See Audi AG,* 469 F.3d at 550. The injunctive relief assures this.

Cuervo argues that an injunction is inappropriate because it ceased use of the dripping wax seal more than five years ago and there is no proof that it intends to resume.[35] While these precise facts may be true, the Court disagrees with Cuervo's conclusions drawn from them. At trial, Casa Cuervo Chief Executive Officer Juan Domingo Beckmann testified that he ceased use of the red dripping wax because he did not want a legal fight, but that he prefers to use the seal. "I like the way it looks, and I would like to be able to use the dripping wax because it looks more hand-crafted. But if I am going to be sued over it, or if I have to pay in order to use it, I simply wouldn't." Thus, Cuervo ceased using the mark based on a practical business judgment. That judgment is laudable but not conclusive here.

In these circumstances, the Court finds that equity supports injunctive relief. *See Am. Bd. of Psychiatry and Neurology, Inc. v. Johnson-Powell*, 129 F.3d 1, 15 (1st Cir. 1997) (court does not abuse its discretion by affirming an injunction when the nonmoving party has voluntarily

---

[35] The Court believes Cuervo does not intend now to resume use of the red dripping wax seal. Nevertheless, Beckmann's testimony leaves open the possibility that Cuervo would do so pending the outcome of this litigation. Certainly, Defendants have not foreclosed that possibility.

abated the use); *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001) ("defendants face a heavy burden to establish mootness"). Moreover, there is an affirmative reason for the injunction. Equity also requires that Maker's Mark receive some tangible evidence of successfully protecting its trademark rights.

2.

The remaining question is how to define the scope of that remedy. District courts are given significant latitude in fashioning injunctions. *Audi AG*, 469 F.3d at 500 ("scope of injunctive relief is reviewed for abuse of discretion") (citing *Gibson Guitar*, 423 F.3d at 546). However, courts favor relief closely tailored to the infringement, especially in cases where the defendant's behavior does not signal bad intent. *See Forschner Group v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d. Cir. 1997)("the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation"); *Wynn Oil v. Am. Way Service Corp.,* 943 F.2d 595, 609 (6th Cir. 1991) (noting that broader injunction was acceptable where defendant was "bold enough to engage in willful infringement"); *see also Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 390 (5th Cir. 1977) ("unqualified injunction ... is justified by [defendant's] history of improper behavior").

A relatively narrow injunction is appropriate here for several reasons. First, the parties are involved in further litigation before this Court related to a similar mark. Also, Maker's Mark did not prove that Defendants engaged in improper behavior, or adopted the red dripping wax seal with bad intent. Finally, the Court's determination that Cuervo's use infringed was a close-call under these facts. A broad, punitive injunction is not warranted and could be counterproductive. Thus, the Court's grants Plaintiff's request for an injunction as follows:

The Diageo and Cuervo Defendants, their officers, agents, servants and employees, and all those persons in active concert or participation with them are hereby enjoined from using red dripping wax on the cap of a bottle in the sale, offering for sale, distribution or advertising of Cuervo tequila products at any locality within the United States.[36]

Cuervo urges the Court to define the injunction even more narrowly, by limiting it to the Reserva product. The court finds that definition too restrictive because it would not prevent the use of the seal on an only slightly different product, or a product more closely related to Maker's Mark, such as a less expensive product.[37] Thus, Cuervo is prohibited from using the red dripping wax seal on any tequila product sold in the United States, including the Reserva.

### B.

The Lanham Act also provides that a plaintiff who succeeds on an infringement claim "shall be entitled ... subject to the principles of equity, to recover 1) defendant's profits, 2) any damages sustained by the plaintiff, and 3) the costs of the action." 15 U.S.C. 1117(a).[38]

Maker's Mark asserts that a reasonable royalty is a proper substitute for defendant's profits as an appropriate measure of damages, especially when damages are difficult to calculate. *See Sands, Taylor & Wood Co. v. Quaker Oats. Co.*, 978 F.2d 947, 963 (7th Cir. 1992) *aff'd in part and vacated in part*, 34 F.3d 1340 (7th Cir. 1994)(applying a royalty rate to assess damages where there was not previous royalty agreement between the parties). Cuervo argues that

---

[36] The Plaintiffs have limited the scope of their requested injunctive relief to Defendants' U.S. sales.

[37] Cuervo cites a statement by the Court at trial asserting that it woule not limit use of the seal on products other than the Reserva. After careful consideration of all of the evidence, the Court has decided that its injunction should cover tequila products generally, and not just Reserva.

[38] The Lanham Act further provides that "no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration." 15 U.S.C. 1117(a). Thus, lack of notice of the registration of the mark can serve as a defense to an award of damages under certain Lanham Act claims. Here, the parties dispute whether Cuervo had actual notice of Plaintiff's mark. The Court does not address this issue in detail because even if Cuervo had actual notice the Court does not see fit to award damages.

royalties are generally appropriate only where the infringer used the mark beyond the allowed period, or where a royalty rate was negotiated between the parties. *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d Cir. 1999). The Sixth Circuit has not directly addressed the issue. In any event, both parties' experts analyzed reasonable royalty rates based on the factors enumerated in *Georgia-Pacific Corp. v. United States Playwood Corp.* 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd* 446 F.2d 295 (2d. Cir. 1971), *cert. denied*, 404 U.S. 870 (1971).[39]

For the reasons that follow, the Court concludes that an award of any damages is inappropriate here.

## 1.

The statute says a prevailing plaintiff is "entitled" to damages, but qualifies that directive with the language "subject to the principles of equity." 15 U.S.C. 1117(a). Damages awarded in trademark cases are designed to (1) make the plaintiff whole, (2) prevent the infringer from being unjustly enriched, and (3) deter future infringement. *See Frisch's Restaurant v. Elby's Big Boy*, 661 F.Supp. 971 (S.D. Ohio 1987) *aff'd* 849 F.2d 1012 (6th Cir. 1988); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d. Cir. 1992); *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 30 (1st Cir. 2002).[40]

---

[39] The parties applied various calculations to the question of money damages, but the expert testimony focused primarily on reasonable royalties and Defendants' profits. Maker's Mark's damages expert, Krista Holt, argued that the *Georgia-Pacific* factors support an award of a five percent royalty on Diageo's Reserva sales to wholesalers in the United States. Cuervo's expert, Thomas Neches, analyzed the factors and recommended the Court award no damages or damages no greater than one percent of Cuervo's Reserva sales. John Kennard, a branding expert for Cuervo, also testified about the *Georgia-Pacific* factors. He, too, argued that assuming the parties would agree to a royalty rate, one percent would be a reasonable royalty.

[40] Most of the cases in this section address a plaintiff's request for "an accounting" of defendant's profits. Though Maker's Mark does not request that remedy, the reasonable royalty rate it does request is typically a substitute for an accounting of profits, and thus the analysis is applicable here.

Only a handful of cases from this circuit offer guidance on awarding damages for trademark infringement. These cases either deny damages under circumstances similar those presented here or award damages based on factors not present here. Collectively, they suggest that this Court could properly deny monetary damages where, as here, there is neither harm to the plaintiff nor gain or willful infringement by the defendant. In *Wynn Oil v. American Way Service Corp.*, the Sixth Circuit reversed a trial court's decision to award an injunction but not damages where the court placed upon the plaintiff the burden of proving the defendant's profits. 942 F.2d 595, 605 (6th Cir. 1995). In that case, the district court awarded attorney's fees but declined to award damages because it "could not ascertain profits made as a result of Defendants' willful infringement." *Id.* The appeals court remanded the case for additional findings related to the amount of damages, and later upheld the trial court's damages award, except for the amount of interest it awarded. *Id.; Wynn Oil Co. v. American Way Service Corporation,* 1995 U.S. App. LEXIS 19191 *10 (6th Cir. July 20, 1995).

In contrast, the Sixth Circuit, in *Nalpac v. Corning Glass Works*, upheld a trial court's decision to award an injunction but deny damages where the defendant acted in good faith, did not know of the other trademark when it began use of its infringing mark and ceased use of the mark after plaintiff filed suit. 784 F.2d at 755 (6th Cir. 1986).[41] In affirming the lower court's decision, the Sixth Circuit noted that this was "not the usual trademark infringement case"

---

[41] Plaintiff asserts that *Nalpac* was decided under old law, because willful infringement is no longer required for a plaintiff to obtain a disgorgement of profits. *See Nike, Inc. v. Top Brand Co.*, 2005 U.S. Dist. LEXIS 42374 *33-34 (S.D.N.Y. July 13, 2005). While Plaintiff may be correct, the Court finds the *Nalpac* analysis helpful beyond the issue of willful infringement, because bad faith is still one of many relevant factors to consider when awarding damages. *See id.* (citing *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 347-49 (5th Cir. 2003); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 171-174 (3rd. Cir. 2005)).

because the infringer, Corning, had much stronger name recognition, marketing channels and advertising capacity than did Nalpac. *Id.* The Court appeared to indicate that such factors would decrease the likelihood of intentional infringement.

More recently, the Sixth Circuit affirmed another trial court decision denying damages. *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 668 (E.D. Mich. 2005), *aff'd*, 469 F.3d (6th Cir. 2006). There, the district court asserted that "there is no automatic monetary award even where a plaintiff succeeds in proving infringement." *Audi AG*, 381 F. Supp. 2d at 668. The court then referenced the "subject to the principles of equity" language in the statute, and went on to say:

> courts have held that an accounting [of profits] will not be ordered merely upon a showing of infringement, since, under the Lanham Act, accounting may be denied where injunction will satisfy the equities of the case. *Laskowitz v. Marie Designer, Inc.*, 119 F.Supp. 541 (S.D. Cal. 1973). The Court finds that although Defendant's infringement was willful, statutory damages are not appropriate in this matter. Defendant alleges that he has not made a profit from [his infringing website]. Under these circumstances, the Court finds that an injunction satisfies the equity of the case.

*Id.* at 669.

Trademark commentators reinforce the view that monetary relief is not always appropriate in an infringement case. According to McCarthy on Trademarks, judges typically look for intentional or improper behavior before awarding monetary damages in addition to an injunction. He states:

> [I]njunctive relief is generally granted upon a strong showing of a 'likelihood of confusion' and neither proof of actual confusion nor proof of intent is required. However, when it comes to making an award of monetary relief for acts of past infringement, judges are hesitant to do so ... without that indefinable 'something more.' Monetary liability in trademark cases without fault or knowingly performing illegal acts seems to give most judges considerable pause. However, evidence of actual confusion of some customers or evidence of actual losses suffered by plaintiff will often supply the missing element even where defendant ignorantly blundered into an infringing act.

MCCARTHY, *supra* note 12, § 30:58 *Introduction–Comment: theory and practice of monetary awards* (4th ed. 2008).

2.

Neither the cases or commentary, nor the evidence, convince the Court to award monetary damages here.  Maker's Mark offered no proof that Cuervo's use of the red dripping wax seal caused it to lose actual sales or goodwill. Cuervo's proof suggested that it did not profit from the use of the dripping wax seal because sales of Reserva grew proportionately, before, during and after Cuervo used the dripping wax. As noted above, Maker's Mark offered no significant evidence of actual confusion.  Moreover, Cuervo ceased use of the mark voluntarily at the start of this litigation, indicating that it will not willfully infringe Maker's Mark's trademark in the future. Finally, no evidence proved intentional copying or bad faith. As was the case with the Corning defendant in *Nalpac*, the sheer size of Cuervo and the extensive brand recognition it already enjoyed would suggest that there really was no incentive for Cuervo to copy Maker's Mark's trademark in order to increase sales.  Though it is true that none of these factors, taken alone, would necessarily preclude damages, when considered together, they are compelling. Because the proof at trial did not show harm to Maker's Mark, gain to Cuervo, bad faith on the part of the Defendants or quantifiable consumer confusion, the Court finds that a monetary award, in any form, is not warranted here.

For all of these reasons, an injunction without an award of damages is the equitable and proper result here. The injunction prevents consumer confusion and acknowledges and protects Maker's Mark's significant legal interest in the red dripping wax seal, a mark that has become the symbol of its company. It also serves as a sword Maker's Mark can wield against Diageo and

Cuervo, in the unlikely event they resume their use in the future. To a lesser degree, it also protects Maker's Mark from other competitors or quasi-competitors in the industry, in that it may serve to discourage them from treading too closely on the mark. Neither Diageo nor Cuervo need pay money damages for a wrong from which they derived little benefit. Furthermore, it is not equitable to award Maker's Mark damages that are decidedly uncertain and certainly unproved.

The Court will enter an Order consistent with this Opinion.

cc:    Counsel of Record